ROBERT D. BYERS (SBN 159871)
LAW OFFICES OF ROBERT D. BYERS
420 Third Street, Suite 250
Oakland, California 94607
Telephone: (510) 465-4000
Email: robertbyers@bayareajustice.com
Attorney for Defendant RODNEY LAMAR GREEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RODNEY LAMAR GREEN,<br><br>Defendant. | Case No. 4:26-cr-00277-YGR<br><br>DEFENDANT RODNEY LAMAR GREEN'S SENTENCING MEMORANDUM AND RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM<br><br>Date: October 8, 2026<br>Time: 9:30 a.m.<br><br>Hon. Yvonne Gonzalez Rogers |

## I. INTRODUCTION AND REQUESTED SENTENCE

Rodney Green is a 45-year-old tattoo artist and father of two who has a seizure disorder. It began five or six years ago, after a car struck his motorcycle and left him on life support for two days. PSR ¶ 47. On the night of March 21, 2026, he suffered an apparent seizure at the wheel and crashed into an unoccupied parked car at 26th and Filbert Streets in Oakland. He was in and out of consciousness. A paramedic, concerned about the disoriented man on his gurney, looked inside a backpack and found a privately made Polymer80 pistol and two magazines holding 37 rounds of .40 caliber ammunition. Mr. Green was a person prohibited from possessing them, and he has pleaded guilty to being a felon in possession of

ammunition, 18 U.S.C. § 922(g)(1). He accepts responsibility for that.

The seizure disorder is the reason the gun was found. Mr. Green asks the Court to consider that it is also a large part of the reason the gun was there. He ran a tattoo shop and carried its earnings in cash; officers found $11,080 in his socks that night. PSR ¶¶ 8, 11, 52. He had watched people robbed on Oakland's streets since childhood, he had been robbed at gunpoint himself, and his godbrother was shot and killed. PSR ¶ 43. Mr. Green's account, which he will give the Court himself, is that as an African American man in Oakland he felt vulnerable to gun violence, and that with a seizure disorder he felt more vulnerable still. He kept a gun because of that fear. That was an unlawful answer to a very real fear. Mr. Green offers it as an explanation and not as a justification.

The question for the Court is how much custody is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Probation and the government agree that the answer is far below the advisory range. The advisory range is 30 to 37 months (total offense level 17, Criminal History Category III). Probation recommends a variance to 15 months. PSR at 18 (ECF No. 14). The government, under paragraph 14 of the plea agreement, recommends the same, 50 percent below the low end of the range. Government's Sentencing Memo (ECF No. 15) at 5–6; Plea Agmt. ¶ 14. Probation's report explains why: the firearm was discovered not through "threatening behavior or confrontation" but through "an accident that occurred due to his medical problems," and Mr. Green's record is "mostly dated." PSR ¶ 80.

Mr. Green asks for a further variance. Probation's recommendation accounts for how the gun was found. It does not address why Mr. Green had it, and Part V.B does. He respectfully requests a sentence of six months of imprisonment, followed by three years of supervised release with a condition that he serve the first six months in home detention with location monitoring, together with the recommendations and conditions in Parts VI and VII below. That is twelve months of confinement in total. It follows the form the Guidelines themselves prescribe one offense level below the range from which the 15-month recommendation is drawn. See Part V.E.

## II. STATEMENT REGARDING EVIDENTIARY HEARING (Crim. L.R. 32-5(b)(1))

The defense does not request an evidentiary hearing. Neither party seeks a departure; the plea agreement so provides (¶ 7), and the 2025 Guidelines Manual no longer contains departures. See PSR ¶ 78. The request is for a variance under 18 U.S.C. § 3553(a).

## III. BACKGROUND

### A. The Offense

At about 9:30 p.m. on March 21, 2026, officers responded to a report of a vehicle collision at 26th and Filbert Streets in Oakland. Mr. Green was in and out of consciousness in the driver's seat. A witness reported that the car had hit an unoccupied parked car after Mr. Green had suffered an apparent seizure. PSR ¶ 6; see also Government's Sentencing Memo at 4:12, "Observers reported that the driver appeared to have had a seizure." Paramedics put Mr. Green on a gurney in an ambulance. Because he was disoriented and because of the weight of a backpack, a paramedic looked inside it "for his safety" and handed the bag to officers. PSR ¶ 7. Inside were a Polymer80 PF940SC pistol with no serial number, a magazine holding eight rounds, and an extended magazine holding 29 rounds, 37 rounds in all. PSR ¶ 8; Plea Agmt. ¶ 2. There was no round in the chamber. PSR ¶ 8. Officers also found $11,080 in Mr. Green's socks. PSR ¶ 8.

There was no threat, no confrontation, no display of the gun, and no victim. PSR ¶¶ 9, 80. Mr. Green was a man in a medical emergency whose bag was opened by a medic.

Mr. Green was arrested by Oakland police that night (Alameda County Superior Court No. 26-CR-003826). He was released on his own recognizance on March 25, 2026, and the state charges were later dismissed. PSR ¶ 32. Present defense counsel represented Mr. Green in the state proceedings.

### B. Procedural History

On June 4, 2026, a one-count indictment charged Mr. Green with violating 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), with a forfeiture allegation. He was arrested on June 17, 2026, appeared before Magistrate Judge Tse on June 18, and waived a detention hearing on June 23, 2026, as a condition of the government's plea offer. He has been in

continuous federal custody since June 17, 2026, and is housed at the West County Detention Facility. PSR at 1 & ¶ 4. On July 23, 2026, he pleaded guilty under a Rule 11(c)(1)(A) and (B) agreement. The final PSR was filed on September 24, 2026.

## IV. THE ADVISORY GUIDELINES

### A. The Calculation

The parties agree, and Probation found, that the base offense level is 20 under U.S.S.G. § 2K2.1(a)(4)(B) (a semiautomatic firearm capable of accepting a large capacity magazine, and a prohibited person), that no specific offense characteristics apply, and that three levels come off for acceptance of responsibility, for a total offense level of 17. Plea Agmt. ¶ 7; PSR ¶¶ 12–22. Probation assessed four criminal history points: three for a 2012 sentence of four years (PSR ¶ 28; U.S.S.G. § 4A1.1(a)) and one for a 2022 misdemeanor (PSR ¶ 29; U.S.S.G. § 4A1.1(c)). Three older convictions scored no points. PSR ¶¶ 25–27 (U.S.S.G. § 4A1.2(e)(3)). That is Criminal History Category III and a range of 30 to 37 months in Zone D. PSR ¶ 59. The defense does not object to this calculation.

### B. The 2025 Manual Contains No Departures

The Court applies the Guidelines Manual in effect on November 1, 2025. PSR ¶ 12. That Manual removed departures and the policy statements on personal characteristics (former §§ 5H1.1–5H1.12). U.S.S.G. § 1B1.1 & Ch. 1, Pt. A (Nov. 1, 2025) (describing Amendment 836 as "outcome neutral" and stating that judges "would continue to have the authority to rely upon" the same facts "to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)"); PSR ¶ 78. Mr. Green therefore asks for a variance, not a departure.

### C. Minor PSR Correction

Typographical error in PSR ¶ 4 (a date reading "2016" for the June 17, 2026 transfer to federal custody).

## V. THE § 3553(a) FACTORS

### A. Governing Principles

The Guidelines are "the starting point and the initial benchmark," but they are advisory,

and the Court "may not presume that the Guidelines range is reasonable." Gall v. United States, 552 U.S. 38, 50 (2007); United States v. Carty, 520 F.3d 984, 991–94 (9th Cir. 2008) (en banc) (declining to adopt an appellate presumption of reasonableness for within-Guidelines sentences); Kimbrough v. United States, 552 U.S. 85, 101–11 (2007). The Court must impose a sentence "sufficient, but not greater than necessary" to serve the purposes in § 3553(a)(2). The Court may consider the "fullest information possible concerning the defendant's life and characteristics," because "the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 488 (2011) (quoting Williams v. New York, 337 U.S. 241, 247–48 (1949)); 18 U.S.C. § 3661.

**B. The Seizure Disorder and the Nature and Circumstances of the Offense (§ 3553(a)(1))**

Possessing ammunition after a felony is a serious federal crime, and Mr. Green does not suggest otherwise. But one fact runs through the circumstances of this offense: Mr. Green's seizure disorder. It is how the offense was discovered. On Mr. Green's account it is also much of why he was carrying a gun.

**How the offense came to light.** Most felon-in-possession cases begin with a gun in a hand, a car, or a house during a stop, a search, a shooting, or another crime. This one began with a medical emergency. Probation put it this way: the seizure "differentiates Mr. Green from other defendants charged in similar cases who are indicted after being involved in other criminal activity." PSR, Justification at 19; see also PSR ¶ 80. Mr. Green was not engaged in any other criminal conduct when the gun was found. He was unconscious or barely conscious, and a medic opened his bag. There was no use, display, or threat. No one was harmed or threatened, and the only collision was with an unoccupied parked car. PSR ¶¶ 6, 9. The offense is serious because of what could happen, not because of anything that did.

**The condition.** Mr. Green's seizures began after a motorcycle accident about five or six years ago, in which a car struck him in an intersection. He was on life support for two days and in treatment for about a month. He is prescribed Keppra. PSR ¶ 47. The record shows what a seizure does to him. On November 10, 2021, he was found unresponsive in his car on the Carquinez Bridge after a solo collision. He was conscious but could not answer questions,

had no recollection of the collision, and told officers he had a history of seizures. He then had a seizure at the hospital in front of the officers, who noted "a lack of mental capacity at that point." PSR ¶ 29. On March 21, 2026, a witness reported the apparent seizure, officers found him "in and out of consciousness," and the paramedic described him as "disoriented on the gurney." PSR ¶¶ 6–7. Probation found that "[a] seizure appears to have been the cause of the accident," PSR, Justification at 19, and the government describes him the same way. Government's Sentencing Memo at 4:12–14 ("disoriented and injured").

**Why he carried a gun.** Mr. Green told Probation that, while running his business in Oakland, he "was fearful of leaving with his cash earnings without protection." PSR ¶ 11. The record gives that statement content. He owned RD Tattoos, worked about 50 hours a week, and averaged about $10,000 a month. PSR ¶ 52. The $11,080 found on March 21 was about one month of those earnings, and he was carrying it hidden in his socks, which is consistent with a man afraid of being robbed of it. PSR ¶ 8. The PSR reports no evidence that the money was the proceeds of a crime. He had seen robberies on Oakland's streets since childhood, had been robbed at gunpoint in his early twenties, and had lost his godbrother to a shooting. PSR ¶ 43.

A man carrying cash can ordinarily watch his surroundings, leave, fight, or call for help. Mr. Green could not count on that. As he understood his condition, any physical encounter could leave him incapacitated or worse. He knew a seizure could put him where the record shows it has put him twice: unresponsive or confused, alone, and unable for some time to see a threat, respond to it, or even recall what happened. He believed a gun in his bag gave him some measure of protection against that vulnerability. On March 21, 2026, at night, on an Oakland street, with $11,080 on him, Mr. Green had a seizure and crashed his car. PSR ¶¶ 6–8.

How he kept the gun is consistent with that account. It was in a backpack, with no round in the chamber. PSR ¶¶ 7–8.

**The limits of the explanation.** Mr. Green pleaded guilty, and nothing here retreats from the plea. Fear of robbery is not a defense to this charge. The justification defense requires a present threat of death or serious bodily injury and the absence of a reasonable legal

alternative, United States v. Lemon, 824 F.2d 763, 765 (9th Cir. 1987), and it does not permit a person with a felony conviction to arm himself in advance because he fears, however sincerely, that he is in danger. United States v. Wofford, 122 F.3d 787, 790–91 (9th Cir. 1997). Mr. Green had legal alternatives. He could have deposited his receipts more often, taken payment electronically, or arranged not to travel alone with cash. He chose a gun, and he understood that choice was a crime.

**Why the explanation matters.** A sentencing court may consider why a defendant did what he did. 18 U.S.C. §§ 3553(a)(1), 3661; Pepper, 562 U.S. at 488. The guideline calculation here does not. With no specific offense characteristic applied, the offense level turns on the kind of firearm and magazine and on Mr. Green's status, and it would be the same whatever his reason for having the gun. PSR ¶¶ 13–22. Until 2025 the Guidelines Manual addressed such facts through a policy statement: a lower sentence could be appropriate where a defendant committed an offense "in order to avoid a perceived greater harm," former U.S.S.G. § 5K2.11. This provision was removed with the other departures, but the Commission described the amendment as outcome neutral and preserved the Court's authority to rely on the same facts under § 3553(a). See Part IV.B. Mr. Green does not claim that he would have qualified for that departure; former § 5K2.11 itself withheld a reduction where the interest in punishment or deterrence was not reduced. He cites it to show only that a perceived need for protection has been a recognized ground for a lower sentence even where it is no defense.

Motive bears on culpability. A gun kept in a bag by a man afraid of being robbed while he is incapacitated is unlawful and dangerous. It is still a different thing from a gun carried to rob, to retaliate, or to settle a dispute, which is the conduct the government's memorandum describes when it writes of robberies, shootouts, and neighborhoods turned into "combat zones." Government's Sentencing Memo at 2:11–14, 3. Nothing in the record puts Mr. Green's conduct on March 21, 2026, in that category. Probation reached the same conclusion: he "was not engaged in criminal conduct prior to the gun being found." PSR, Justification at 19. What the explanation means for deterrence and for protection of the public is addressed in Part V.D.

**The guideline range.** The offense level is 20 rather than 14 because a semiautomatic

firearm was in the bag together with a magazine that could hold more than 15 rounds. Compare U.S.S.G. § 2K2.1(a)(4)(B) with § 2K2.1(a)(6) and § 2K2.1 cmt. n.2 (a magazine "in close proximity to the firearm" suffices). The six-level difference arises from the bag's contents rather than from any action Mr. Green took toward another person. The count of conviction is for possession of ammunition.

**C. Mr. Green's History and Characteristics (§ 3553(a)(1))**

**Childhood in Oakland.** Mr. Green was born in San Leandro in 1981 and grew up in Oakland. His father drove a truck and was often away, though he remained "one of his biggest supporters." PSR ¶ 41. His mother had a crack cocaine dependency. When he was eleven, she entered a rehabilitation center and he spent a year in the foster care system, then with an aunt, without understanding why he had been removed from home. PSR ¶ 42. She completed treatment, he returned to her, and she has been sober since. Id. Probation found no abuse or neglect, PSR ¶ 43, and Mr. Green does not claim otherwise. But he grew up watching people being robbed on Oakland's streets, was himself robbed at gunpoint by a masked man in his early twenties, and about ten years ago lost a godbrother, to whom he was close, to a shooting. PSR ¶ 43. The government acknowledges that "he observed violent crime from a young age." Government’s Sentencing Memo at 6:4–5. That history is part of the explanation in Part V.B. It does not excuse the offense.

**Health.** Mr. Green's seizure disorder, the accident that caused it, and its effects are described in Part V.B. PSR ¶ 47. He reported no mental or emotional health problems. PSR ¶ 48.

**Family.** Mr. Green has a seven-year-old son, "RJ", and a 21-year-old daughter who lives in Oakland and with whom he has a close relationship. PSR ¶ 44. He and his son's mother divorced in 2020 but co-parent "well" and amicably. Id. Before his arrest he "spent as much time as possible" with his son, who has been told that his father is "on vacation" so that he does not have to see him in custody. PSR ¶ 44 & Justification at 19. The government notes that he "has a young son and expressed dedication to his children." Government’s Sentencing Memo at 6:8–9.

**Work.** For about ten years Mr. Green has worked as a tattoo artist. He owned RD Tattoos in Oakland, worked about 50 hours a week, and earned about $10,000 a month; before that he spent three years at Ink Addiction and earlier worked at his uncle's car wash and with his father in carpentry. PSR ¶¶ 52–54. He left school after the 11th grade. PSR ¶ 51. He told Probation that investors were ready to open a second shop with him in downtown Oakland and that artists were ready to work there. PSR ¶ 46. Probation found that he "has held stable, gainful employment and has indicated he has a place to continue this employment after his release." PSR, Justification at 19. The government agrees that "he appears to have the tools and skills to seek employment as a tattoo artist." Government's Sentencing Memo at 6:9.

**Faith and change.** Mr. Green told Probation that during his state prison term he became more involved in his faith, "leaned on [it] since that time," and "turned over a new leaf," and that in custody he spends time "sharing his faith with others and building them up." PSR ¶ 45. He stopped smoking marijuana about four years ago and has used no other substance. PSR ¶ 50. Probation concluded that he "appears to have made a change in his life by focusing on his work as a tattoo artist and being a present father to his son." PSR, Justification at 19.

**His record.** Mr. Green has a criminal record and the Court has it in the PSR. He does not minimize it. Three of the five prior convictions are old enough that they score no points. PSR ¶¶ 25–27. The most serious, the 2012 conviction for violating Penal Code § 266h, PSR ¶ 28, is now more than thirteen years old, and he served a four-year prison term for it. The PSR reports that he is a registered sex offender who was current in his registration at the time of the 2021 arrest. PSR ¶ 29. Probation, which knows the record, nonetheless describes it as "mostly dated" and concludes that he is "accurately represented in Criminal History Category III." PSR ¶ 80 & Justification at 18.

**The 2021 incident.** The government and Probation both point to November 10, 2021, when Mr. Green crashed on the Carquinez Bridge, was found unresponsive, and officers later found a loaded, serial-less firearm in a bag in the car; he was convicted of a misdemeanor under Penal Code § 29800(a)(1) and received one year of probation. PSR ¶ 29. The 2021

report was written more than four years before this case, by officers with no reason to help him. It documents the seizure disorder, what a seizure does to him, and the same facts found here: a gun in a bag in his car, discovered only because a seizure brought responders to him. Probation calls the circumstances "nearly identical." PSR at 21. The history of his firearm sentences is also relevant to deterrence. The 2010 felony resulted in 180 days in jail and probation (PSR ¶ 27), and the 2021 event resulted in a misdemeanor and one year of probation (PSR ¶ 29). The sentence requested here, six months in federal prison, six months of home detention, and three years of federal supervision with a search condition, is more than he has received for any gun offense.

**D. The Purposes of Sentencing (§ 3553(a)(2))**

**Seriousness, respect for the law, and a just punishment (§ 3553(a)(2)(A)).** The government places this offense in the context of Oakland's gun violence, noting that Oakland "suffered 67 homicides" in 2025, Government's Sentencing Memo at 2:16–17, and describing a "surge" in federal firearm enforcement beginning in March 2026 that led to charges against 51 defendants, of whom "Mr. Green is one." Government's Sentencing Memo at 5:17–20. Mr. Green does not minimize the toll of gun violence in his own community; he lost his godbrother to it. But the sentence must be tied to this defendant and this offense, not to the city's homicide rate. Mr. Green's conduct did not involve a shooting, a threat, or an exchange. It involved a gun kept in a bag, for the reasons in Part V.B, by a man with a seizure disorder. Being one of 51 people charged in an enforcement initiative is not a reason to impose a sentence higher than his individual conduct warrants. See Pepper, 562 U.S. at 487–88; 18 U.S.C. § 3661. Six months in federal prison, of which he has served roughly 3.7, followed by six months confined to his home and three years of federal supervision, is a substantial punishment. It is Mr. Green's first federal term, and it has separated a father from a seven-year-old son who has been told his father is on vacation.

**Deterrence (§ 3553(a)(2)(B)).** The government argues that "[n]one of these convictions or sentences deterred Mr. Green" and that a "meaningful sentence" is needed to deter him. Government's Sentencing Memo at 5:27–6:2. The government itself notes that a

sentence in this case "would mark the first time Mr. Green has been in federal custody or on federal supervision." Government's Sentencing Memo at 6:1–2. The seizure disorder bears on specific deterrence in a way particular to Mr. Green. Most people who carry a gun unlawfully can expect it to stay hidden. He cannot. Twice in less than five years a seizure has put him, unresponsive, in the hands of police and paramedics, and both times they found the gun. PSR ¶¶ 6–8, 29. The 2021 arrest should have taught him that. It ended in a misdemeanor and a year of probation, and it did not. PSR ¶ 29. This case has already cost him more than three months in custody and will end in a federal felony conviction and a prison term. He now knows that for him, carrying a gun means being caught with it. As to general deterrence, a federal felony conviction, six months in prison, and six months of home detention send a message that the law will be enforced. Nothing in the government's memorandum suggests that nine more months in prison would deter others more. Mr. Green's own statement to Probation is that he "will never be back in a courtroom after this case." PSR ¶ 11.

**Protection of the public (§ 3553(a)(2)(C)).** The risk the government identifies is a person unlawfully carrying a firearm. Three years of supervised release with a firearm prohibition and a search condition, which Probation recommends and Mr. Green does not oppose, address that risk after his release. For the first six months, home detention with location monitoring adds to them.

**Treatment, training, and care (§ 3553(a)(2)(D)).** Mr. Green needs continuity of anti-seizure medication and monitoring, which is a medical reason to limit his time in custody. PSR ¶ 47. Physical altercations are a risk of confinement for anyone. Mr. Green's concern, given how his seizures began, is that a blow or a fall in custody carries more risk for him than for others, and there he cannot choose the people around him. A seizure disorder does not make a prison term inappropriate. It makes prison more dangerous for Mr. Green, and that is a reason to keep the term short.

He has no history of substance treatment needs beyond marijuana use that ended about four years ago. PSR ¶ 50. The Court should not lengthen the term to allow program participation. 18 U.S.C. § 3582(a); Tapia v. United States, 564 U.S. 319, 335 (2011) (court

may not impose or lengthen a prison term to promote rehabilitation).

**E. The Kinds of Sentences Available and the Guidelines (§ 3553(a)(3)–(5))**

The statute leaves the Court the full range of sentences. The maximum term is 15 years, and supervised release may run up to three years. PSR ¶¶ 58, 60. Probation is statutorily authorized for this Class C felony. 18 U.S.C. § 3561(c)(1); PSR ¶ 62. It is the advisory Guidelines that call for prison, because the range of 30 to 37 months is in Zone D. PSR ¶¶ 59, 63. The 2025 Manual contains no departures and expressly preserves the Court's authority to vary on facts of the kind discussed above. See Part IV.B.

Mr. Green does not ask for probation. He received probation in 2022 for having a gun and carried one again, PSR ¶ 29, and he accepts that this offense calls for a prison term. He asks for a split sentence: six months of imprisonment, followed by supervised release with the first six months in home detention with location monitoring. 18 U.S.C. §§ 3583(d), 3563(b)(19). The Guidelines supply the form. The 15 months that the government and Probation recommend is the low end of the 15-to-21-month range at offense level 12 and Criminal History Category III, the lowest Zone D range in that category. One level lower the range is 12 to 18 months, in Zone C, where the Guidelines themselves provide that the minimum term may be satisfied by imprisonment followed by supervised release with home detention, so long as at least half of the minimum term is served in prison. U.S.S.G. § 5C1.1(d)(2), (e)(3). Six months in prison and six in home detention is that sentence. Measured by time in prison it is six months against the fifteen recommended, and Mr. Green does not suggest that home detention is the equivalent of prison. But for those six months Probation will know where he is and may search his person, home, and car on reasonable suspicion, and he can be treated for the seizure disorder by his own physicians. PSR at 20; 18 U.S.C. § 3553(a)(2)(D). The Ninth Circuit has affirmed a sentence that went further on this same range. United States v. Ruff, 535 F.3d 999, 1001–03 (9th Cir. 2008) (range of 30 to 37 months; one day of imprisonment and supervised release with twelve months and a day in a residential corrections center).

**F. Unwarranted Disparities (§ 3553(a)(6))**

Probation reports that for defendants sentenced under § 2K2.1 with a final offense level of 17 and Criminal History Category III over fiscal years 2021–2025, the average sentence was 29 months and the median 30 months (1,624 defendants, 96 percent of whom received imprisonment). PSR ¶ 75. That data is Probation's, drawn from the Judiciary Sentencing Information platform, and by its terms is not a Commission recommendation. PSR ¶ 76. The data describes a mine-run of § 922(g) and § 2K2.1 cases with the same offense level and criminal history, including cases involving possession in the course of other crimes. The Court's task is to avoid unwarranted disparity "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Probation has already identified why Mr. Green is not similar to the average § 2K2.1 defendant: the gun was found because of a medical emergency, not because of criminal conduct. PSR, Justification at 19; PSR ¶ 80. Part V.B adds a second difference: why the gun was there. A variance for those reasons is not an unwarranted disparity; however, ignoring them would be.

**G. Response to the Government's Memorandum**

The government's memorandum is, on the whole, fair to Mr. Green. It concedes that he took "early and full responsibility," and that his history and characteristics "support a more lenient sentence." Government’s Sentencing Memo at 6:3–7. There are, however, two differences: (1) the 2022 conviction was a misdemeanor, not a felony, PSR ¶ 29; see Government’s Sentencing Memo at 5:26–27; and (2) the Oakland homicide statistics describe a problem that this offense did not contribute to; no one was threatened and no gun was fired.

**VI. FINE, SPECIAL ASSESSMENT, AND CREDIT**

**Fine.** Probation recommends a $10,000 fine, the bottom of the $10,000–$95,000 range, citing Mr. Green's assets. PSR at 18–19 & ¶¶ 55, 66. The Guidelines direct a court to consider "the burden that the fine places on the defendant and his dependents," and permit a lesser fine or waiver if a fine "would unduly burden the defendant's dependents." U.S.S.G. § 5E1.2(d)(3), (e); 18 U.S.C. § 3572(a). Mr. Green's income of about $10,000 a month stopped when he was taken into custody on June 17, 2026; he has a seven-year-old son and a 21-year-old daughter;

his reported net worth of $51,000 consists of two bank accounts totaling $4,000 and four older vehicles valued at $47,000 (PSR ¶ 55), and his monthly expenses were about $4,200; and he hopes to open a second shop after release (PSR ¶ 46). The defense asks the Court to waive the fine or reduce it substantially and, in the alternative, to set a payment schedule that does not begin until after release. PSR at 21 proposes payment through the Inmate Financial Responsibility Program at not less than $25 a quarter, then at least $200 a month or 10 percent of earnings. The Special Assessment is standard.

**Credit for time served.** Mr. Green has been in continuous federal custody since June 17, 2026, about 113 days as of the sentencing date. He was also in state custody from his arrest on March 21, 2026, until his release on his own recognizance on March 25, 2026, on charges later dismissed. PSR ¶¶ 4, 32. The Bureau of Prisons computes credit under 18 U.S.C. § 3585(b); United States v. Wilson, 503 U.S. 329, 331–33 (1992). Mr. Green asks the Court to recommend credit for all time in official detention on this offense, including March 21–25, 2026.

## VII. SUPERVISED RELEASE

Mr. Green does not oppose the three-year term Probation recommends. PSR at 18–19; 18 U.S.C. § 3583(b)(2). He does not oppose the standard conditions.

As to Recommended Condition 3, which would subject "any computers, cell phones, and other electronic devices" to search on reasonable suspicion, Probation correctly states that a search condition for electronic devices requires "a properly supported factual finding that establishes some nexus between computer use and the supervised release goals of deterrence, public protection, or rehabilitation." PSR at 20–21 (citing United States v. Bare, 806 F.3d 1011, 1013–14 (9th Cir. 2015)). Nothing in this offense involved a computer, phone, or electronic device, and the Probation justification identifies no use of a device in this offense. Mr. Green asks the Court to strike the searching of electronic devices but to keep the search condition for his person, residence, and vehicle, which bear directly on the offense.

Mr. Green also asks the Court to add a condition that, for the first six months of supervised release, he be restricted to a residence approved by the Probation Office at all times

except for employment, medical treatment, religious services, court and probation appointments, and other activities the probation officer approves in advance, with location monitoring. 18 U.S.C. §§ 3583(d), 3563(b)(19); U.S.S.G. § 5F1.2. Mr. Green will need to secure a residence before his release. PSR ¶ 39. If none is approved, he asks that the six months be served in community confinement instead. 18 U.S.C. § 3563(b)(11); U.S.S.G. § 5C1.1(e)(2).

## VIII. CONCLUSION

Mr. Green committed a serious offense and has pleaded guilty to it. He is not the offender the government's statistics describe. He has a seizure disorder. It is why his gun was found, and on his account, it is much of why he had one: he carried his earnings in cash, he had been robbed before, and he knew a seizure disorder made him vulnerable in public. He has a stable livelihood, a seven-year-old son who needs him (the requested sentence would allow Mr. Green to spend the Christmas holidays with his son), a daughter in Oakland, and a faith that he says has changed him. Probation and the government both recommend a variance to 15 months. For the reasons above, Mr. Green respectfully asks the Court to sentence him to six months of imprisonment, followed by three years of supervised release with the first six months in home detention and the other conditions discussed above, a waived or reduced fine, and the $100 special assessment.

DATED: October 4, 2026

Respectfully submitted,

Robert D. Byers

Robert D. Byers
Attorney for Rodney L. Green